Exibit A

**Grievances:**

While in the Davis County Correctional Facility, you have the right to file a grievance relating to any condition of confinement, including but not limited to: medical care, classification actions, disciplinary procedures, food, clothing and bedding.

First speak to your Housing Unit Deputy. He/ She may have a solution to your problem. If this doesn't resolve your problem, you may file a formal grievance. Your grievances are expressed on the Inmate Request and Grievance Form, which can be found on the Kiosk.

You may NOT grieve decisions handed down by the courts, or disciplinary sanctions imposed by the Disciplinary Hearing board. You may appeal the sanctions of the disciplinary hearing process by submitting a disciplinary appeal request on the kiosk.

**Mail:**

Outgoing Mail: You may send as much mail as you wish as long as you have sufficient funds on your commissary account. Outgoing mail is subject to be checked. Mail sent to the courts or attorneys will be considered confidential, but may be checked for contraband in your presence. Legal mail is only considered "LEGAL" if it is sent to the address of an Attorney or Court.

You may not write letters to other inmates housed in the Davis County Jail unless they are immediate family. Proof must be available.

1. Pictures or drawings are not allowed on envelopes. Any envelopes with pictures or drawings may be returned to you.

2. The following return address must be included on the top left hand corner of the envelope:

Your name

Inmate booking number

Davis County Correctional Facility

P. O. Box 130

Farmington, Utah 84025

3. All letters must have complete sender's name and address. Letters will be returned if not complete.

4. If you are indigent under the commissary rules, you may receive two envelopes, with two sheets of paper each, per week, from the Commissary Inmate Welfare program. Inmates' commissary accounts will be charged for all orders.

Davis County Correctional Facility

Inmate Handbook



**520.00 GRIEVANCE PROCEDURE**

A. In the interest of inmate rights, and allowing them redress to perceived violations of their rights, a grievance procedure will be in place. The intent of the grievance process is to benefit inmates, jail officials, and the efficiency and equity of jail operations.

B. If an inmate has a grievance concerning a situation or a person, the grievance may be filed on an Inmate Request Form.

1. All grievances should first be addressed, and resolved if possible, by the Housing Deputy

2. If the Housing Unit Deputy cannot resolve the problem, or they are the subject of the grievance, the grievance will be forwarded to the Watch Commander

3. If the Housing Unit Deputy or the Watch Commander cannot immediately resolve the complaint, the grievance will be forwarded to the Classification Section for examination.

a. An initial response on the grievance will be returned to the grieving inmate with five (5) working days by the Classification Section.

b. Recommendations will be made to the Division Commander regarding the grievance.

4. Grievances may be forward to any appropriate level of command, including the Sheriff.

a. All grievances should begin at the lowest level possible. Grievances filed at higher levels may be sent to the appropriate level for resolution or investigation.

5. Certain inmate problems or grievances may need to receive, or at least expedited handling. These types of grievances will be handled immediately by the deputy who receives the grievance or he will take the grievance directly to the Watch Commander. Examples of these types of grievances include but are not limited to:

a. medical treatment

b. fire and life-safety complaints

c claims concerning missed release dates

d. other matters for which delay would significantly prejudice the inmate

6. Staff retaliation against an inmate for filing a grievance is prohibited.

C. Scope of Grievance Issues

1. The following are appropriate areas for the submission of grievances

a. The substance, interpretation, and application of policies, rules, and procedures of the Davis County Correctional Facility affecting an inmate personally.

b. Individual employee and inmate actions affecting the inmate personally, including denial of access to the grievance procedure.



c. Any reprisals against inmates by staff for filing a grievance or using the grievance system.

d. Any other matter relating to the conditions of confinement or care within the Davis County Correctional Facility or Work Center.

D. Inappropriate Grievance Issues

1. Federal and State Court decisions.

2. Federal, State or County laws and regulations.

3. Disciplinary Board decisions.

a. Generally not a grievable issue unless some aspect of the disciplinary process is handled incorrectly.

4. Other matters beyond the control of the Davis County Correctional Facility.

5. An inmate's classification level.

6. An inmate's housing assignment.

E. Frivolous grievances are a violation of jail policy and will be denied. Disciplinary sanctions may be assessed for filing frivolous grievances.

F. Grievances must be filed within ten (10) days of the grievable event.

G. Inmates must exhaust all administrative remedies before pursuing legal action for alleged inmate rights violations.

Davis County Correctional Facility

Policy and Procedures Manual

Revised April 25 2017


INMATE COPY

ALLEGATION(S)

1. On September 26, 2020, the plantiff was ordered by officer SC Lewis to allow correctional officers to put cuffs on him and then move units from Pod 6 Quebec Housing Unit, which was the plantiff's current Housing Unit, to Pod 2 Fox Housing Unit, which was the shu for disciplinary housing, followed by the search and seizure of the plantiff's legal mail that morning around 0900 hours.

2. At around 1030 hours, Sergeant Hutchinson entered the Pod 6 Housing Unit, for the second time since the search and seizure, and when asked by the plantiff what was going on and if he should get ready to go to Fox?, Sergeant Hutchinson ignored him.

3. At around 1100 hours, the entire housing unit was told by the Los to lockdown for lunch. It was during this time that the plantiff was approached by SC Lewis and many other correctional officers while locked down inside Cell 21 in the Quebec Housing Unit. The plantiff requested permission to pack his own property and wanted to know why he was being punished. When officer SC Lewis denied his request and refused to answer his question, the plantiff was then only being argumentative and posed no threat.

4. At around 1910 hours, CERT members, Sergeant Hutchinson, Corporal T. Nix, officer Rummel, officer Terrell, officer SC Lewis, and officer Major, entered Quebec Housing Unit. Meanwhile before this occurred, at 1624, Sergeant Hutchinson received clearance from Captain Meldrum that the CERT team would be activated to assist in the movement of Abreu.

Before entering the Quebec Housing Unit, all of the requested CERT team members, Sergeant Hutchinson, Corporal T. Nix, officer

Rummel, officer Terrell, officer SC Lewis, and officer Major, arrived to the Briefing Room where Sergeant Hutchinson informed the CERT team that inmate Abreu had barricaded himself inside his cell. Sergeant Hutchinson stated Abreu would be moved from Quebec to Fox. Sergeant Hutchinson also reported that inmate Abreu was incarcerated for charges of attempted homicide, kidnapping and assault (I think it is important to note that those are not my correct charges for purposes of arguement later regarding such briefing being misinformed, misleading, and a misrepresentation of the plantiff's reputation and person by Sergeant Hutchinson and those involved.) Sergeant Hutchinson also reported misleading information that inmate Abreu had a razor and weapons in his cell while in Davis County Jail. Sergeant Hutchinson also reported that inmate Abreu flooded his cell, covered the window of the cell to prevent anyone from seeing inside, and that he also had a history of assault. The CERT team was also informed by Sergeant Hutchinson that Abreu was refusing to cooperate and he was also making preparations to fight.

5. Because of being misinformed, mislead, and there being a misrepresentation of the plantiff's reputation and person by sergeant Hutchinson and by other officers, CERT team members such as Terrell, Major, and SC Lewis decided that Abreu was preparing for a fight or that he was concealing a weapon of some kind, without having the plausible merits to do so, which resulted in the excessive force from defendants once contact was made and was provoked by skepticism, various pretense, and misjudgment that was subjective to each officer knowingly and unruly.

6. From the time the plantiff was nearly peacefully approached by correctional officers, at around 1100 hours, to the time CERT team members entered the cell to remove Abreu from with force, at around 1912 hours, not only is it clear to notice the change in attitude with SC Lewis based on his supplemental report and compared to his initial demeanor towards Abreu when contact was made before his briefing. No other contact or action was made to remedy the risk to the plantiffs health or safety that was evident to the person in charge officially, Captain Meldrum, and where other officials, Sergeant Hutchinson, Corporal T. Nix, Correctional officer Christopher Rummel, Correctional officer Wilbert Terrell, Correctional officer SC Lewis, and correctional officer Major, knew that something was cruel, or objectively unusual, and failed to remedy it or take action. Instead a conspiracy was drafted against Abreu based off of what has been mentioned thus far and of the unknown to the plantiff, so much so, the agreed action between the defendants and others involved was the plan to use violence against a misrepresented perception of a violent plantiff. The defendants failure to even attempt a remedy or a conversation to prevent a wrong shows the attitude and demeanor of each defendant and not that just of Correctional officer SC Lewis. The defendants, individually and as a group, knew of and disregarded the excessive risk to the plantiff, the facility, the staff, and to the other inmates health or safety. It was determined by those in charge, Captain Meldrum and Sergeant Hutchinson, the course of action to give and recieve clearance so that the CERT team would be activated to move Abreu without any mental, emotional, or physical communication given otherwise. Based off of Jail Incident Reports regarding the defendants summarys of

events from the day of and the incident to this claim, it is evident from the defendants perspectives and allegations, that Abreu was flooding his cell and moving water out onto the tier from under his cell door. Abreu covered his window and was yelling erratically without rationality according to the defendants. It was also noticed by defendants that the cell, Quebec 21, was covered with blankets, water, trash, and what looked like food and other materials Abreu had inside his cell. With such observations made and the plaintiff being institutionalized for two years at the time of the incident, added to the lack of evidence but quick conclusion by the defendants to say that Abreu harmed himself without regard to the plaintiff's statements stating otherwise or the possibility of the facts present and missing that say different. The determined course of action by those in charge should have first considered emotional and mental distress then figured a remedy to the prevention of any current or potential risks to the health or safety of the plaintiff by offering and imposing a level of health services reasonably designed to meet emergency and then routine psychological care and medical treatment as the only means of force. Instead the defendants officially in charge made the choice to misjudge the plaintiff and profile him as some violent convict using only the information surrounded by their own personal conviction of him. And the facts used to brief the CERT team by Sergeant Hutchinson joined by what other officers used, such as Wilbert Terrell, who the plaintiff has written grievances on for unrelated incidents that involved profiling and harassment complaints in the past during the plaintiff's incarceration, not only were the facts used

pernicious but they were also frivolous or simply not true. Attention was purposely focused on the facts used by defendants to assess the situation and those specific facts used then created individuals as well as team incentive to use excessive force against the plaintiff by the wanted defendants as it was perceived through manipulation, imagination and imagery that Abreu was violent. So such force would be or may be necessary during his cell extraction in the minds of the defendants. With that thought of violence and the need of an excessive force being engaged, intentionally or not, in the minds of the defendants before the LERT team even entered the Quaker Housing Unit or the cell Abreu was to be removed from. In conclusion to the briefing between LERT team members and those officials in charge, implicating the plaintiff as a force of violence potentially life threatening only caused the defendants distress. That distress was inflicted upon the defendants before 1912, when they entered the cell the defendants were already influenced to use exces-sive force and that distress affected the view of each defendant coming into the plaintiffs cell and their ability to be rational with the need for force of it the need for force even arose. The need for force was already a factor without the need having to come from the plaintiffs actions. Using excessive force was acceptable with the need for force already in the minds of the defendants prior to the cell extraction. It did not matter if the plaintiff was only being argumentative and posed no threat. And emotional nor mental distress was ever to be considered on the plaintiffs behalf when the defendants had distress that amounted to only one course of action and that was violence with the need for force being created

through selective facts and misrepresentation of the plantiff by the defendants. Not once was Abreu viewed with the respects as a person, father, brother, or son when the defendants determined the need for the force. Abreu was viewed as a violent offender and such a conviction was made and used by defendants when actions against the plantiff were considered, or not considered, and the need for the force was decided on by the defendants for use against the plantiff. Incentive the defendants used for the force was based on views of the plantiff that the defendants chose to look at rather than the reality of the situation, and were allegations that could of been argued at best, and were used to profile the plantiff to determine the actions of the defendants that resulted in the use of force and then excessive force against the plantiff without due process being given as the plantiff still is, and was at the time a pretrial detainer on charges alleged by the defendants for the need of force. Nor was any due process given on the search and seizure of the plantiffs legal mail that morning by officer Z. Jolley, which was the start of events that lead to all else on the day of, and was also used against the plantiff, amoungst much more alike, by the defendants as incentive for the use and need of force. None of which was means for the defendant to activate the CERT team without first regarding medical care, mental health, a remedy without risk to health or safety, or taking action such as attempts to talk to the plantiff after he was given the time to reason during his distress or after. At around 1910 hours Sullivan became the floor officer for Quebec Housing that

7. From around 1100 hours to 1912, Abreu remained locked inside cell 21 in the Quebec Housing Unit. And there was never a time the plantiff was addressed

or made aware of through conversation or concern by the officers and the defendants. Not once did the officials or the defendants attempt to defuse the situation by taking action to provide a seperate solution that did not require the use of force and activating the CERT team. The simple way to put it is the conversation around 1100 hours happened when the plantiff was commanded to allow officers to place cuffs on him for a move from Quebec to Fox while Abreu was locked inside his cell. When Abreu was denied the request that he made to pack his own property before submiting to the demands of Correctional officer SC Lewis and after expressing his concern for allowing officers to pack his property that was spread throughout the cell he was housed in for months due to the amount of property belonging to the plantiff and his prior experience with officers handling his property during a move by throwing everything together in one bag (food, beverages, papers, utensils, legal documents, pictures, hygiene, clothing and shoes), without order or care, resulting in the property being damaged. Specific was the plantiffs concern for the pictures of his son. The plantiff being denied his request to officer SC Lewis, then caused and influenced Abreu to refuse the command of that same officer. Abreu refused the command as he replied to the denial of his request and stated that he was not going to cuff up until he packed his property. It was then mentioned by officer SC Lewis that there was no time to waste allowing the plantiff to pack his property and the officers then turned to leave the Quebec Housing Unit. The time after the above encounter with officers did not involve another moment where the plantiff had any contact or attempted contact with officers until around the time of 1912 when CERT team members entered Cell 21 in Quebec to remove Abreu from the cell with the use of force. I find it important to note that from the hours of 1100 to 1912

officers entered the Housing Unit multiple times. Most memorable to the plantiff are the times officers entered the Housing Unit during lunch around 1200 hours, Dinner around 1630 hours, Head Count around 1800 hours, to turn off the water for the toilet to cell 21 around 1330 hours, and Rounds every hour. During those times no contact or attempted contact was made by officers and defendants in regards to the plantiff. The plantiff was avoided and the remedial action was never taken, to the point of the importance of food not being offered to the plantive during meal times as the officers didn't even bother asking Abreu if he wanted to eat and ignored his requests for food when passing lunch and dinner trays to the other inmates in the Housing Unit. And even more so, the officers and the defendants refused to acknowledge the health or the safety of the plantiff when entering the Housing Unit, the significance of future rounds being noted here, without the having the ability to see Abreu physically with the cell window being covered and without efforts verbally made to communicate with Abreu otherwise as a means of a wellness check during the entire duration of time that the plantiff was locked in the cell from 1100 hours to 1917. The absolute only other contact made by officers and defendants was at 1912 when excessive force was then applied. The plantiff did not entirely refuse the order he was given by the defendant at 1100 hours. It was clearly stated by Abreu to the officers that his intentions of refusing the order at that time was to pack his property and then comply to the order afterwards. As the officers walked away, Abreu was never given the chance to comply once his property was secured and protected at best. There was never a threat made by the plantiff as he was defending his property from being destroyed or damaged. The plantiff was not being violent nor did he provoke the harm that was later inflicted against him by defendants.

The plantiff desired a solution that did not require serious risk or result in physical force. The action that supports this is the only act made in this incident that was an effort to communicate and eliminate risk by putting on the cuffs and moving to Fox after such order was made. And the plantiff was the one to do so by pressing the speaker button in the ceil that is used to contact the tos. Abreu did so after packing up his property inside the Cell following shortly from the time he talked with the defendant SC Lewis. At around 1200 hours the plantiff made contact with the dos and told her that he had his stuff ready to go and was willing to follow orders, if she could send the officers in so they could hurry up and get it over with. The dos replied saying that she was busy eating lunch, not to bother her and if I wanted to follow orders then I should of done so earlier on my time not hers. That was the only other contact made that didn't involve officers. Then the dos ignored any further communication through the speaker system by refusing to answer when the plantiff pressed the call button. The plantiff had never experienced being in jail longer than a day or two except for his experience from the two years spent as a pretrial detainee in Davis County jail at the time of events. Based on that experience Abreu did not even know a CERT team existed. And when a inmate would refuse an order or act erractic while showing signs of aggressive behavior officers would give such inmate time to reason, especially when already confined to a cell, then make contact with the inmate numerous times while making conversation to resolve the issue until serious risk wasn't a issue and the inmate showed intentions to follow orders. Abreu figured the time would come when

a officer or official would make contact with him and then the move would happen. Abreu had his property stored on the top bunk in order with respects to the officer who would search the property when Abreu was moved and the plantiff was ready and willing to move. As the time passed without contact being made by officers or officials and while being ignored without knowing what to expect or what was going on the plantiff experienced distress that started with the anxiety from wanting to get the move over with and instead being left in the cell the officers wanted to move him from when he was willing to leave and the not knowing what was going on made it worse. Any behavior by the plantiff while experiencing distress from the situation was later reasoned well before CERT entered the Housing Unit. The plantiff fell asleep and woke up still waiting for the officers to make the move or make contact. By this time the plantiff was no longer arguementative and was not a threat. The jail had been on lockdown the entire time since being told to do so for lunch around 1100 hours. The plantiff was still expecting the move to happen without force as he was more than willing. Meanwhile the defendants had a briefing and had been planning force to be used against Abreu. The time defendants had to determine a course of action that was determined with violence added to the time spent before acting with the force in mind is what made the reality of violence predictable without making another outcome possible.

At around 1912 while the plantiff was listening to his radio the end of what Sergeant Hutchinson was saying was heard being "...how do you Comply?". Before the plantiff could even process what was said or understand what was going on after

approximately eight hours of solitude the door to Quebec C1 was opened. The plantiff did not notice team members entering the housing Unit, nor had the plantiff ever seen what a CERT member presented with their gear on. The time the plantiff was allowed to respond to Sergeant Hutchinson was not enough to even react when the cell door opened revealing what Abreu immediately thought was SWAT. The seriousness of what was going on became apparent to the plantiff as the defendants, Sgt Hutchinson, Cpl. T. Nix, officer Rummel, officer Terrell, officer SC Lewis, and officer Major, entered the cell. The door to the cell opened before CERT members were even given the chance to ready themselves for what Hutchinson was saying. When the cell door opened and before any defendants made entry the CERT member who was positioned first looked caught off gaurd and was pushed by the CERT member behind him as there was a moment of stillness until that push happened. The Plantiff was positioned at the back of the cell and was standing with a radio in hand while eating fireball candy when the CERT team started to enter. The Plantiff backed up to the bunk as the CERT team approached out of concern for his safety and health. Multiple direct orders were made simultaneously by defendants that consisted of, "put your hands in the air", "get down on your stomach", "show me your hands", "get down on the ground with your chest". Defendants made it impossible to follow one officer's request without having to refuse another. The plantiff sat on the bunk at the back of the cell as a response to all the orders being shouted by CERT team members. The CERT members wore full protective gear which made them difficult to distinguish. Having armored aggressive grown men in all black with helments on

that included face shields, approach the plantiff with evident force to be used against him caused Abreu to fear for his life and submit to the inevitable unnecessary risk of serious harm that was disregarded by defendants and forced upon the plantiff by the attack made and conspired through the actions of the same defendants with such disregard. Abreu assumed a guarded position and allowed the defendants to subdue his person with the excessive force they planned to use. When contact was made and the CERT team engaged, the plantiff went from a sitting position on the lower bunk to leaning into the frame of the bottom bunk as he dropped to the floor with a hurried motion due to a fierce pain inflicted to his stomach by the force used by the defendants once contact was made. The force continued to be used against the plantiff forced Abreu to turn facing the wall as he was being handled by CERT team members and during his fall to the floor. Once Abreu touched the ground with his knees the defendants pinned his head to the metal frame of the lower bunk with the use of their knee being pressed into the back of his head. Meanwhile the plantiff's arms, legs, and body was being dismantled as officers picked, pulled, pushed, shoved, tossed, twisted, restricted, and abused whatever piece of Abreu they could get their hands on. At one point during the attack two officers tugged the plantiff's left arm in seperate directions as both of the defendants went to was over the control of that limb. While being dominated by CERT members the pain coming from the plantiffs stomach became more intense as the defendants caused bodily injury that felt like a ripping of flesh to the plantiff who was defenseless and posed no threat when defendants were cutting him on the floor and when he was put there from the stabwound

to his abdomen that was acquired when initial contact was made and the defendants attacked the plantiff with what felt like a blunt object going through his side with extreme velocity and force that made a sound best described as a balloon popping. Once the pain and suffering from the injuries reached the peak of burning, stinging, and bleeding the plantiff bursted with the need to move which could be considered the only resistance made that was even then out of the control of the plantiff who is better addressed as victim. The exact offender can only be assumed as there was six defendants on the CERT team and the plantiff was experiencing extreme forces used against him from each defendant at the times bodily injuries were inflicted upon the plantiff maliciously and sadistically by the CERT team with deliberate indifference. Those who failed to oversee or address the violation(s) are being held accountable as well. As the plantiff was dominated by CERT members before his burst of movement and while restraints were being applied the communication between the CERT members became relevant as scissors used and carried by every correctional officer, including CERT, were mentioned and the officer who had them out was told to put them away that the plantiffs cloths, which were soaked and covered with lubricates, could wait and be removed later. After the plantiffs burst of movement restraints were applied as CERT members had Abreu on his stomach. Handcuffs and leg shakles were used to secure Abreu's hands behind his back and legs together. As restraints were being applied Abreu began screaming from the pain and suffering that was being caused by the continued force that was excessive as defendants restrained Abreu and the bodily injuries

that needed emergency medical attention but instead were disregarded as defendants slammed Abreu into the ground on his stomach and weight paired with the force used by multiple CERT members was effectively causing more pain and suffering. The plantiff was then screaming and yelling that his stomach was injured and that the defendants stabbed him. The defendants applying the handcuffs were having problems locking the cuffs because the cuffs were not functioning properly. It was decided by CERT members to not lock the cuffs and to continue with their extraction. When the plantiff's stomach was finally inspected, the amount of blood from the area of concern and around the cell was enough means to request a _____.

9. At around 1916 hours, EMS was activated by Nurse Ashley as requested by officer Major and Sergeant Hutchinson. Abreu kept screaming in pain about his stomach. Abreu was handled with very little concern or regard for his injuries as officers carried Abreu from Quebec 21 to the gurney that was in the middle of the Housing Unit. Abreu was carried by the handcuffs behind his back and by the shackles around his ankles with his stomach facing the floor and without any support for the weight of his body used. Because of being carried this way and the handcuffs not being locked, the 260 pounds from the plaintiff, without support, began to tighten the cuffs as the CERT members carried the plaintiff by those same cuffs leaving his body dangling with blood gushing from his stab wound. It is noted that defendant T. Nix and Deputy Major applied the handcuffs as Christopher Pimmel and Terrell applied the leg shackles and Sgt Laws applied the cuffs and shackles as Hutchinson observed. It is suggested that Abreu was carried specifically with respect to where the restraints were placed

and by which defendant being the same defendants who assumed those same positions when carrying the inmate.

10. It's important to note that officers don't mention them noticing a wound or injury until after the restraints were applied and only one CERT member claims to see blood before contact was made and one other officer says they only thought they seen blood but did not give a future statement. Yet after the restraints were applied each CERT member mentions the amount of blood seen being a large amount.

11. At around 1916 when CERT members carried Abreu out of the cell (restless), Nurse Ashley let out a high pitched scream or yelp upon seeing the injured plaintiff. The plaintiff was carried down the stairs where he was almost dropped multiple times. Officers then placed Abreu on the gurney that was in the middle of the housing unit, instead of at the stairs, and put the plaintiff on his stomach.

12. At around 1918 CERT members and medical left the unit with Abreu on the gurney. The plaintiff was being wheeled towards the vehicle Sally to the distance. During this time the plaintiff continued to scream from the pain and started to voice discomfort from the restraints. The cuffs became so painful from how tight they were the plaintiff started voicing more concern for the pain and suffering from the cuffs more than anything else.

13. Turning the plaintiff started having troubles breathing and stopped grunting or screaming. Officers and nurses had to stop many times to check the plaintiffs breathing. Before this the plaintiff was asked by defendants how he was injured and he made it clear that the officers stabbed him.

14. Once defendants got Abreu to the vehicle Sally he had

stopped responding completely as officers cut all of his clothing off before placing the plaintiff on Farmington Fires gurney on his back with the unsecured cuffs becoming even tighter as Abreu was forced to lay on them.

15. Once the plaintiff was in the abulance headed towards DAVIS Hospital for his wounds it was founded that Abreu had been choking on a Fireball candy which added to his trouble breathing, when Abreu became responsive he requested many times for the John Doe officer riding in the back of the ambulance to adjust and lock the cuffs as he expressed concern for losing feeling due to loss of circulation and how he needs his hands for work being a professional chef and barber. The officer refused to adjust so the inmate begged him but still the officer refused at or around 1938 hours.

16. Once at the hospital Abreu requested many times for Terrell and Pommill to adjust cuffs but they refused even as Abreu expressed the same concern as before.

17. It was determined that Abreu suffered from a stabwound and multiple lacerations to the abdomen. Staples were applied and instructions were given to the defendants on a document for the treatment regarding the injuries, such as steristrips were to be applied after staples were removed in 10 days which never were resulting in a larger scar.

18. While at the hospital defendant Terrell made a joke with the doctor that Abreu obviously made zero good life decisions based on him being in jail. Abreu confronted both Terrell and the doctor saying that he has actually been in cooking magazines for being a chef and even owned a restaurant before so he didn't appreciate either of them laughing

at him when they should be helping him instead. Terrell then accused the plaintiff of trying to sneak drugs into the facility while regarding the morning incident without giving proper due process. The plaintiff replied saying if that is what happened then he can't control what is mailed.

19. Doctors examined them via X-ray for trouble breathing, MRI for the stab wound and other methods. It was assessed there being a laceration to the anterior abdominal wall which was closed with staples. And rectal foreign body which turned out to be phone numbers and a ring. It was also noted by hospital staff that the plaintiff remained in handcuffs.

20. At around 2130 hours Abreu arrived back at the jail where Nurse Ashley examined him.

21. After being examined by Nurse Ashley the plaintiff was interviewed by officer Sgt E. Johnsen from the Farmington Police Department. Once it was mentioned by the detective that the plaintiff wasn't YET facing any criminal charges for the incident that occurred, Abreu stated he would only speak with a lawyer present. That concluded the interview and no other interview was conducted by any officers on the plaintiff's behalf despite mentioning many times after that officers stabbed him. On 10/1/20 investigator BAEZ for Davis County Jail mentioned to Abreu he would have to interview him in regards to being stabbed and Abreu agreed but BAEZ never did the interview.                                              At about 1930 hours on 9/20/20

22. Sgt. E. Johnsen was initially told that the inmate, Abreu, had lacerated himself with a razor. During the search of the cell Sgt. E. Johnsen was unable to find a razor. The only item he was able to find was two pencils that were on the outside of the cell door amongst the tuna and other debris. The same detective was able to observe the plaintiff's abdomen area, at around 2130 hours, and see that he had several scratch marks around the laceration

being the third wound. Sgt E. Johnson reported that the scratches did not appear to be from a razor blade and concluded that it is unclear what the injured used to cause his injuries.

23. I would like to note that at around 1630 hours there was a briefing held in the Briefing Room by Sgt Hutchinson with all the requested CERT Team members attending. During this meeting Sgt Hutchinson reported that the Plaintiff had been charged with having a razor in his cell while in Davis County jail. This report is false and a clear violation of the Plaintiff's due process as due process was given for the alleged charged yet it was still reported as an incentive to act with force when the cell extraction was planned. About a year prior to this incident the Plaintiff was charged by the defendant Terrell for being another inmate's cell while a haircut was given. Terrell admitted to knowing Abreu was not involved and the razor not being his or the cell wasn't his where it was found. But because Abreu would not point out who was cutting hair he was charged in regards for the incident and since. Terrell also admitted to seeing Abreu get out the shower minutes prior to him coming to investigate which made it impossible for Abreu to be guilty. Either way this the report was going to officers in a way j to give reason to attack with my excessive force and abuse along with other reports given. Also the report given was harassment as it caused the act that caused the Plaintiff to feel fear, and the act caused injuries that caused the Plaintiff emotional distress. Even after being screamed by the Plaintiff while suffering from pain that officers stabbed him, multiple times and the Plaintiff saying so in other terms, the same defendant, sgt Hutchinson, reported to Sgt E. Johnson that the Plaintiff lacerated himself with a razor without due process or any evidence. It was mentioned by CERT members that there was no razor in the cell before Sgt E. Johnson

arrived at the jail at, or around 1930 hours. Sgt. Hutchinson had no reason to report the razor at the briefing how she did giving the CERT Team the reason to use excessive force and attack the plaintiff. And the defendants had no reason to report the razor to Sgt. E. [illegible] how it was which lead to the final conclusion of his report, once again without evidence of a razor or any weapon to cause the injuries on the plaintiff by the plaintiff as it was said to be self inflicted injuries. And if Sgt. Hutchinson believed Abreu to have a razor in his cell so much so, then why was the serious risk to harm himself not considered or acted on during the times 1100 hours to 1912 hours when Abreu was completely ignored by officials and officers for the duration of that time and not once was the plaintiff's health or safety checked on by defendants, Cpt. Meldrum, Sgt. BAER, Deputy List, Z. Jolley, Sgt. Hutchinson, Cpl. Clark, SC Lewis, Deputy Major, Cpl. T. Nix, Rummel, Terrell, and E. Sullivan, who were all made aware of the risk but did nothing during the times they performed safety and security rounds every hour or the times they entered the section before the CERT Team entered the cell. The point is at 1624 Cpt. Meldrum knew there was a serious risk to health or safety in regards to Abreu's and so did Sgt. K BAER as she was notified around 1800 hours, if not before when she reported for her shift. So did Deputy List around 1800 hours when he conducted Head Count followed by hourly rounds. So did Z. Jolley throughout the day and at 1500 hours when he conducted a safety and security round. So did Sgt. Hutchinson many times throughout the day including when she and Cpl. Clark entered the Housing Unit to turn off the water to Quebec 21, making Cpl. Clark aware as well. And so did E. Sullivan when he was assigned floor officer over Pod 6 at 1910 hours. And so did the CERT Team around 1630 hours when they were having a meeting of such and each defendant failed to act, consider mental health emergency, or remedy the risk and instead disregarded serious risk on both sides, being their truth and the plaintiff's. It's important to understand that no weapon

or object that could have caused the bodily injuries was found in the cell where the plaintiff was housed, in the property of the plaintiff as it was seized and searched by T. Sullivan and other officers, or inside the plaintiff's body as a MRI was done and a search and seizure by Sgt. K. BAER and Cpl. T. Nix was completed on the items inside the plaintiff which was phone numbers and a silver ring. Also the toilet in Cell Z1 did not flush as the water was off from around 1300 hours to past the time the plaintiff was extracted. And on 10/1/20 around 1900 hours Sgt. K. BAER came into the Fox Housing Unit and told the plaintiff that he would not get his property back unless he said another inmate caused the bodily injuries or the plaintiff took blame as there was a lot of "milky water" according to her regarding the incident. Sgt. K. BAER was told then that a CERT Member caused the injuries against the plaintiff and another time infront of Cpl. T. Nix when giving a portion of the property back on Camera in Medical after the inmate wrote a grievance to the mentioned above incident. That is also when Sgt. K. BAER refused to give the plaintiff his prescription glasses unless he told her he caused the injuries or another inmate did, not complying lead to the plaintiff's glasses not being given back along with other items.

24. At around 2145 hours the plaintiff escorted to the Suicide/Safety/Dry Cell Booking and seen in the cell Abreu was given a Safety gown. Then all restraints were fully removed. It was here and at this time Abreu provided officers with the phone numbers and ring. After he did so he talked to Sgt. K. BAER and Cpl. T. Nix and expressed how he didn't agree with how he was being treated as he wasn't Suicidal and he didn't harm himself. (He was noted that the plaintiff was considered mentally disordered before force was used and was seen by mental health until 9/28/20.)

25. It was declared that Abreu was Suicidal and injured himself in the same defendants who caused the bodily injuries so nothing else was considered or investigated fairly as the defendants influenced other officers and officials

involved for obvious reason being to conceal such injuries and actions caused or inflicted against the plaintiff in his claims.

26. The _____ officers and CERT Team members being used as a weapon, intentionally or not, was brought up many times by the plaintiff to officers and never was that taken into consideration or investigated. Sgt K BAKER was told this and her hirecard is the investigator for the jail, yet it was never looked into. Instead the defendants actions were covered up using the same razor that never existed in the briefing as a means to focus only on the inmate harming himself.

27. Medical professionals, who out of concern for their jobs the plaintiff would rather not mention at this point, admitted to the officers working at the jail, and most the defendants specifically, being current and capable of doing something or causing the bodily injuries that Abreu had, and still has, so they belived the defendants did stab the plaintiff.

28. On 9/27/20 at around 7:00 hours the plaintiff stated that his thumbs on both hands were numb from the cuffs being on too tight last night. This was told to the nurse during dressing.

29. On 10/02/20 at around 0800 hours the plaintiff was seen by a physician at the jail who documented Abreu having parasthesias due to handcuffs being applied. And informed the plaintiff the importance of taking his prescribed anti-inflamtory medicine for swelling due to damage of the nerves done to his hands from the cuffs.

30. Eventually medical treatment for the plaintiff's hands was denied causing permanent bodily injury and numbness in both hands.

31. On 10/1/20 to 10/4/20 the dressing on the plaintiff's stabwound was not changed or cleaned for the second time for days at a time. The first being when the plaintiff was in the Medical Housing Unit. Both times the defendant had asked for help many times and was denied. Dates for the first time ___ ___ ___

a dressing change or cleaning was from around 0500 hours on 9/29/20 to the morning off 10/1/20. It was explained by the doctor and ordered to change bandage daily for the first ten days. At on point puss was coming from Abreu's abdomen wound and was really bright red showing signs of infection.

32. At or around 1530 hours on 10/4/20 Medical finally cleaned and re-dressed the wound.

33. On or around 10/5/20 the staples were removed by two Nurses and steri strips were never applied like the Doctor ordered.

34. Eventually the plaintiff was left with a large scar where he was stabbed along with scars on his stomach from the many abrasions that he suffered. And Abreu has seen mental health for dreams considered night terrors and PTSD caused and related to the 9/26/20 incident and events. Also the plaintiff can't hold a book or write for long without a pain or numb feeling rising from his hands to his elbow, which has also caused writing this Complaint to take much needed time for rests and is part of the reason this Amended Complaint is being finished on the last day out of the thirty giving to complete. The plaintiff reported to Mental health professional to having dreams such as the one he had with officers attacking him and waking up with a bloody foot from kicking the concrete wall in his sleep while having the dream that was a night terror. Abreu was first given psychological care on 9/28/20 following the incident on 9/26/20 and it was mentioned by the psychologist that she was not made aware of the plaintiff until that day and does not know why she hadn't met Abreu sooner, especially considering him being incarcerated for two years by that time and the nature of his charges. The plaintiff sought treatment on his own after that but once it was determined the needed medications couldn't be prescribed due to the policy of the jail Abreu stopped seeking treatment except when first conversation is needed regarding the PTSD and night terrors or other mental anguish caused from 9/26/20 and defendants. August of 2021 being the last time Abreu seen mental health. Exhibits B, C, D, [illegible] and [illegible] are to be used as (support for allegations).

# CLAIM ONE

### I. PLAINTIFF(S)

Plaintiff Angel Christopher Abreu, is and at all times mentioned herein a pretrial detainee of the DAVIS County CORRECTIONAL FACILITY. Abreu is currently in confinement at DAVIS County CORRECTIONAL FACILITY, in DAVIS County.

### II. DEFENDANTS

Please refer to the page attached to this complaint titled "I. THE PARTIES TO THIS COMPLAINT for exact details on the following defendants.

Defendants are Cole Meldrum, Amy Hutchinson, Sgt. T. Nix, SC Louis, Deputy Major, K. BAER, Wilbert Terrell, Rummel, John Doe, Z. Jolley, Cpl. Clark, Deputy Liszt, and J. Sullivan.

Each defendant is sued individually and in their official capacity. At all times mentioned in this complaint each defendant acted under the color of law.

### III. VIOLATIONS

1. US Const. art. AMENDMENTS 8 Amendment VIII Further guarantees in criminal cases
"...nor cruel and unusual punishments inflicted."

2. US Const. art. AMENDMENTS 8 Amendment XIV Rights guaranteed
"...nor be deprived of life, liberty, or property, without due process of law."

3. US Const. art. AMENDMENTS 8 Amendment XIII Slavery and involuntary servitude.
"...nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted shall exist within the United States."

### IV. FACTS

Please refer to paragraphs 1-34 of "ALLEGATIONS". Also refer to Exhibit B, C, D, E, and F.

COUNT ONE: (PAGE 2)

was made what such due process as the reason for the move began from an incident where in-house disciplinary due process was not conducted as of yet, nor was the information given to the plaintiff why he was in trouble. Involuntary servitude was inflicted as the defendants had absolute power over the plaintiff and used that power to cause harm. Other causes of action supporting this count the plaintiff realleges and incorporates in/reference of paragraphs 1-31 of "ALLEGATIONS." All defendants knew that a serious risk existed and violated the plaintiffs rights as a person. It is also noted that the actions of the defendants discriminated against the plaintiff and treated him different in the mentioned allegations apposed to other inmates in the similar situation and in doing so the defendants violated the equal protection clause.

ADD GANG?

V. VIOLATION(S) SUPPORTING CLAIM

A.   COUNT ONE: FAILURE TO PROVIDE PROTECTION FROM THE ABUSE, HARRASSMENT, AND ATTACK FROM OFFICERS

It does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether the plaintiff faced an excessive risk of attack that are personal to him which the plaintiff did as mentioned throughout the events of 9/26/20. Such as when the defendant Hutchinson reported to CERT Team members that Abreu was known for having razors as a weapon while in Davis County Jail, when that was not true. Or when reports of Abreu being violent were made with criminal charges he's yet been convicted of and assaults he has not committed were used to engineer the excessive force that was used, who CERT member made which risk of serious harm was disregarded as CERT was activated and the cell extraction was done without remedial actions taken first. The entire incentive for using force against Abreu was based on the misrepresentation of the plaintiff presented by Sgt. Hutchinson that was personal to him and making the plaintiff seem violent. If officials must protect inmates from the abuse, harassment, and attack from other inmates, then the officials shall be held to the same standards protecting inmates from officers. Instead Sgt. Hutchinson held a briefing with CERT Team members that was formed, misread, and was a misrepresentation of the plaintiff's reputation and person by Sgt. Hutchinson and those involved being Cpt. Meldrum who activated the CERT Team, and the CERT Team members themselves, that ultimately provoked the excessive force and attack against Abreu that resulted in bodily injuries. All those mentioned failed to provide protection from officers to the plaintiff while knowing the plan of attack was cruel, or objectively unusual, and failed to remedy it or take action otherwise. The process was not given as CERT was activated and the make the decision to use force

3.      COUNT TWO: EXCESSIVE FORCE

When defendants made contact with the plaintiff during a cell extraction, bodily injury was caused from the force the defendants used while the plaintiff posed no threat, the force was not necessary and the cell extraction performed by CERT members could have been prevented by contact being made that did not involve violence or when the plaintiff asked the OLS to tell officers he was willing to move cells. Every defendant knew of serious risk to health or safety and disregarded it by their actions and failing to act or provide a remedy. Because of the actions of officers that relates to this claim the plaintiff was deprived of life, liberty, or property, without due process as the extraction itself was done so regarding an incident the morning of that resulted in a unreasonable search and seizure of the plaintiffs legal mail without giving cause or explanation and was the reason the plaintiff was ordered to move in the first place with multiple officers and defendants refusing to tell the plaintiff why he was being moved or what was going on. Not once was the plaintiff offered due process or even given the simple act of a conversation by any of the officers explaining anything. The plaintiff is and was a pretrial detainee yet to be convicted. And from the acts of officers in this claim involuntary servitude was inflicted upon the plaintiff by power of the defendants, the plaintiffs life, liberty, and fortune was affected and resulted in bodily injuries while in custody and innocent of accused crimes. Mental and emotional injury occurred after physical injuries were inflicted. The plaintiff now suffers from PTSD related to the claims as well as a gut because involving officers abusing and attacking the plaintiff, which was confirmed by the mental health professional at Davis County Jail. Other causes of action supporting

Count Two (Page 2)

this Count the plaintiff realleges and incorporates by reference paragraphs 1-34 of "ALLEGATION(S)". The CERT Team members and Cpt. Meldrum are responsible for this count. All defendants knew that a Serious risk existed. And violated the plaintiff's rights as a person.

C.      Count THREE: DENIAL OF Medical, dental or Psychological CARE

Based on events from 9/26/20, the defendants each know that Serious risk existed and failed to remedy it or take action. It was reported that the plaintiff was in possession of a razor by officers, true or not, for the duration of being barricaded inside his cell with the window covered preventing anyone from seeing inside. The razor was reported before, during and after cell extraction. So much so the defendants told detectives Abreu harmed himself with the razor that was, and has been never proven to exist. Physical proof not needed for this count as it was believed by defendants so the risk was real. The plaintiffs mental and emotional wellbeing was reported by the condition of the inside and outside of the cell, his behavior, and the bias decision from defendants to disregard merit and claim the plaintiff harmed himself, eventually placing Abreu on 15 minute Suicide watch after the cell extraction. According to events and the facts, the defendants not only know of Serious risk but know of Serious risk to self, being caused by the plaintiff himself. Officials know that something was cruel, or objectively unusual, and failed to remedy it or take action. Instead the only action taken was excessive force, 8 hours later and meanwhile during safety and security rounds, Head Count, Lunch, Dinner, and any other time a defendant entered the Housing Unit they ignored the fact that they could not see inside the cell and not once did the defendants check on the plaintiff from 1100 hours to 1912 hours $^\wedge$ disregarding the risk they as they reported Abreu as a mentally disordered person, reported knowing and assumed themselves. Not once was emergency psychological care provided nor did the CERT Team respond in a timely manner considering the risk the defendants thought of and accused the plaintiff of committing. And he was an inmate cannot obtain his own medical care and is dependant upon officials, if the authorities fail to do so, those needs will not be met. Considering such with the events

COUNT THREE (PAGE 2)

surrounding the incident and the defendants actions or failure to act, Involuntary servitude is evident with the violation of due process. Other causes of actions supporting this count the plaintiff realleges and incorporates by reference paragraphs 1-34 of "ALLEGATIONS" such actions violated the plaintiffs rights as a person.

D.                    COUNT FOUR: OFFICER ABUSE OF FORCE

Defendants failed to lock the handcuffs used to restrain the plaintiff. The same defendants failed to support the plaintiff when carried to the gurney causing the cuffs to tighten around the plaintiff's wrists cutting off circulation to his hands. Also by carrying the plaintiff without using a board or at least a blanket to support the plaintiff's weight and picking the plaintiff up by the handcuffs and leg shackles, the defendants caused bodily injury to Abreu's hands and his shoulder which was previously dislocated from a separate incident inside the jail that officers should of been aware of if history of the plaintiff was properly viewed before the cell extraction. Defendants were also made aware as the plaintiff screamed from pain and suffering as he was on the gurney. The plaintiff pleading with the defendants to adjust the cuffs and instead was put into a prone position with the cuffs behind his back as his entire body weight laid on top of the cuffs for hours as the cuffs tightened as much as possible for the entire duration. The plaintiff even begged defendants to adjust the handcuffs and to lock them, making it a point to express his concern for his future as a chef and barber, both requiring extensive use of the hands. The defendants disregarded any risk, and failed to remedy it or take action, even with knowing something was cruel, or objectively unusual. The medic in the ambulance even requested John Doe to adjust the cuffs and he refused. The same refusal was given at the hospital by Zummel and Terrel. Defendants also reported to being aware of abdomen injury during the cell extraction but still used excessive force while conducting the extraction and applying the restraints while forcing Abreu stomach first on the ground that was reported to be flooded and full of debris. Not to mention the abuse stated otherwise. All of which was done by the absolute power of the defendants providing involuntary servitude to the plaintiff and violated his rights as a person. Other causes of actions supporting this count the plaintiff realleges and incorporates by reference paragraphs 1-31 of "AUTORTNING"

## VI. EXHAUSTION OF ADMINISTRATIVE REMEDIES

The plaintiff has exhausted his administrative remedies with respect to all claims and all defendants. Copies of such will be attached to this complaint or exist but the plaintiff lacks physical grievances because jail records refuses to supply the copies. It is best the Court knows evidence for all claims exist and the plaintiff is either waiting for GRAMA request(s) to be answered or the request(s) for records have been refused and can be viewed by the court after the complaint is filed through further pleadings and request for documents. It is important to note that DAVIS County Jail does not have a level grievance procedure that allows the inmate to appeal a grievance or write anyone above a watch commander without those grieved having control of such. Also refer to "EXHAUSTION of ADMINISTRATIVE REMEDIES FOR ALL CLAIMS".

## VII. CLAIMS FOR RELIEF

### B. COUNT TWO

The actions of the defendants, Cole Meldrum, Amy Hutchinson, Deputy Major, SC Lewis, Christopher Rummel, T. Nix, and Wilbert Terrell is excessive force inflicting bodily injuries to the plaintiff during a cell extraction, and failing to act or provide remedial actions to risk towards health or safety meanwhile disregarding serious risk while causing pain and suffering physically followed by mentally and emotionally, were done sadistically and maliciously and constitued cruel and unusual punishment in violation of the Eighth Amendment of the U.S. Constitution along with Fourteenth and Thirteenth Amendment violations. The plaintiff realleges and incorporates by reference Paragraphs 1-84 of "ALLEGATIONS" and continues from VI. VIOLATIONS SUPPORTING CLAIM.

### A. COUNT ONE

The actions of the defendants, Cole Meldrum, Amy Hutchinson, Deputy Major, SC Lewis, Rummel, T. Nix, and Wilbert Terrell, is failing to provide protection from the abuse, harassment and attack from officers against the plaintiff by Abreu facing an excessive risk of attack for reasons that were personal to him before, during and after a cell extraction, and failing to act or provide remedial actions towards health or safety, meanwhile disregarding

## VII. CLAIMS FOR RELIEF (CONTINUED PAGE 2)

serious risk that lead to an attack against the plaintff and excessive force used by officers, were done sadistically and maliciously and constitued cruel and unusual punishment in violation of the Eigth Amendment of the US Constitution along with Fourteenth and Thirteenth Amendment violations. The plaintff realleges and incorporates by reference paragraphs 1-34 of "ALLEGATION(S)" and count one from "V. VIOLATION(S) SUPPORTING CLAIM"

### C. COUNT THREE

The actions of the defendants, Cole Meldrum, Hutchinson, T. Nix, Sc Lewis, Deputy Major, Rummel, Terrell, Z. Jolley, Cpl. Clark, Deputy List, F. Sullivan and BAER, is delaying and denying the plaintff psychological attention, and failing to offer emergency psychological treatment, were done sadistically and maliciously and constitued cruel and unusual punishment in violation of the Eigth Amendment of the US Constitution along with Fourteenth and Thirteenth Amendment violations. The plaintff realleges and incorporates by reference paragraphs 1-34 of "ALLEGATION" and count THREE from "V. VIOLATIONS SUPPORTING CLAIM"

### D. COUNT FOUR

The actions of the defendants, Cole Meldrum, Hutchinson, T. Nix, Sc Lewis, Deputy Major, Rummel, Terrell, and John Doe, is officer abuse of force, and failing to act or provide remedial actions to the risk and injuries that occured while disregarding pain and suffering, were done sadistically and maliciously and constitued cruel and unusual punishment in violation of the Eigth Amendment of the US Constitution along with Fourteenth and Thirteenth Amendment violations. The plaintff realleges and incorporates by reference paragraphs 1-34 of "ALLEGATIONS" and count FOUR from "V. VIOLATIONS SUPPORTING CLAIM"

## VIII. RELIEF REQUESTED

WHEREFORE, plaintiff request that the court grant the following relief:

A. Issue a declaratory judgment stating that:

1. The actions of the defendants Meldrum, Hutchinson, Nix, Lewis, Major, Baer, Terrell, Rummel, Doe, Jolley, Clark, List and Sullivan, violated the Plaintiffs rights under the Eighth Amendment of the United States Constitution, with respect to the defendants and each count listed.

2. The actions of the defendants Meldrum, Hutchinson, Nix, Lewis, Major, Baer, Terrell, Rummel, Doe, Jolley, Clark, List, and Sullivan, violated the

VIII. RELIEF REQUESTED (CONTINUED PAGE 2)

Plaintiffs rights under the fourteenth and Thirteenth Amendments of the United States Constitution, declared seperate from the Eighth Amendment declaratory judgement with respect to the defendants and each count listed.

B. Issue an injunction ordering the defendants and Davis County CORRECTIONAL FACILITY TO:

1. STOP activating or performing CERT Team cell extractions without first providing emergency psychological treatment by involving a psychologist to personally evaluate the inmate through safe means of contact and by using conversations, a written message or even family members to communicate with the inmate and correct behavior or get them to comply with officers or orders. Officers and officials are to include the psychologist in any gathering that is to inform others of the inmate or to decide on any plan that uses force against the inmate. The psychologist is to have word at these gatherings as a consideration to provide remedial action with regards to the inmate's health and safety to avoid serious risk through preventing the need of force from officers and exhausting all mediation efforts before activating CERT Team to respond.

2. Undergo and require the officials and officers involved in the September 26, 2020 incident or events from that day, to participate and complete sensitivity training and mental health awareness, to prevent harm and disregard to serious risk from happening further and to provide remedial action.

3. Undergo and require the CERT Team members involved in the September 26, 2020 incident to participate and complete preventative officer abuse of force training, to provide remedial action and prevent further bodily injury, excessive force and abuse from happening.

( PLEASE DISREGARD SECTION C )

C. Issue a temporary restraining order restricting defendants from:

1. Participating in or performing any CERT Team emergency responses or cell extractions until policy and procedure is created and or redressed in regards to "VIII. RELIEF REQUESTED" B(1) injunction and B(2) is at the very least drafted, to provide remedial action and prevent harm from happening further.

2. Participating in or performing any CERT Team emergency responses or cell extractions until training is complete in regards to "VIII. RELIEF REQUESTED" B(3) injunction to provide remedial action and prevent harm from further happening.

VIII. RELIEF REQUESTED (PAGE 3)

D. Award compensatory damages in the following amounts:

1. 5,000 jointly and severally against defendants Meldrum, Hutchinson, Nix, Lewis, Major, Rummel, Terrell, Jolley, Clark, List, Sullivan and Baer, for the denial and delay of emergency psychological care and the complete disregard for the safety or security of the plaintiff that resulted in bodily injuries and mental anguish with respect to Count THREE of Claim and causing pain and suffering.

2. 5,000 jointly and severally against Meldrum, Hutchinson, Major, Lewis, Rummel, Nix and Terrell, with respect to Count ONE of Claim, for failing to provide the plaintiff protection from the abuse, harassment and attack from officers against the plaintiff that resulted in bodily injuries and mental anguish causing pain and suffering.

3. 5,000 jointly and severally against Meldrum, Hutchinson, Major, Lewis, Nix, Rummel and Terrell, for excessive force that resulted in abdomen laceration and abrasions against the plaintiff, with respect to Count TWO, causing pain and suffering and mental anguish.

4. 5,000 jointly and severally against Meldrum, Hutchinson, Nix, Lewis, Major, Rummel, Terrell and John Doe, for abuse of force with respect to Count Four that resulted in paraesthesias to the plaintiff's hands causing pain and suffering and mental anguish.

E. Award punitive damage in the following amounts:

1. 10,000 each against defendants Meldrum, Hutchinson, Nix, Lewis, Major, Rummel, Terrell, Jolley, Clark, List, Sullivan and Baer, with respect to Count THREE.

2. 10,000 each against defendants Meldrum, Hutchinson, Major, Lewis, Rummel, Nix and Terrill, with respect to Count ONE.

3. 10,000 each against defendants Meldrum, Hutchinson, Major, Lewis, Nix, Rummel and Terrell, with respect to Count TWO.

4. 10,000 each against defendants Meldrum, Hutchinson, Major, Lewis, Nix, Rummel, Terrell and John Doe, with respect to Count FOUR.

F. Award discretionary damages each count as it may appear plaintiff is entitled.

G. Award future damages for expected pain and suffering, loss or impairment of earning capacity, and projected medical or psychological expenses as it may appear plaintiff is entitled.

H. Grant such other relief as it may appear plaintiff is entitled.

VIII. RELIEF REQUESTED (PAGE 4)

20, December, 2021
Respectfully Submitted,

ANGEL C. ABREU

PO BOX 130
FARMINGTON, UT 84025